**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| T-ZONE HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:20-cv-02519-DCN |
| | ) | |
| vs. | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| SOUTHSTAR CAPITAL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The following matter is before the court on plaintiff T-Zone Health, Inc.'s ("T-Zone") complaint against defendant SouthStar Capital, LLC ("SouthStar"). ECF No. 1. For the reasons set forth below, the court finds in favor of the defendant.

## I.  BACKGROUND AND PROCEDURAL HISTORY

This case arose out of a series of disputes between T-Zone and SouthStar. On July 2, 2020, T-Zone filed a complaint against SouthStar alleging breach of contract, promissory estoppel, unjust enrichment, and unfair trade practices. ECF No. 1, Compl. On September 1, 2021, the court granted in part and denied in part SouthStar's motion to dismiss, ultimately dismissing T-Zone's unfair trade practices claim. ECF No. 12. On August 7, 2023, the court denied the parties' respective motions for summary judgment, ECF Nos. 32; 33, finding that there existed genuine issues of material facts as to all claims. ECF No. 54. On February 21, 2024, the court held a bench trial for this case. ECF No. 60. Both parties provided exhibit and witness lists. ECF No. 61. On July 10, 2024, the court filed the official transcript from the bench trial. ECF No. 62, Tr.

Having considered the testimony and exhibits admitted at trial, as well as the parties' pre-trial briefs and post-trial proposed findings and conclusions, the court now

1

makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II.  EVIDENCE AT TRIAL[1]

1.  Plaintiff T-Zone is a Canadian company that imports and sells fitness equipment and wellness products.  Tr. 4:15–5:14, 9:14–17.

2.  One of T-Zone's products is a whole-body vibration machine called 20K vibration machines (the "20K Machines").  Tr. 7:10–13.

3.  T-Zone imports the 20K Machines from a Chinese manufacturing company and distributes them from a warehouse in Los Angeles, California called Fulfillment World.  Tr. 5:7–10, 9:18–24, 10:9–12, 24:9–17, 24:18–25:8.

4.  The 20K Machines were shipped from China to the Fulfillment World warehouse in containers.  Tr. 11:2–5.  One container holds, on average, two hundred and twenty-five (225) 20K Machines.  Id.

5.  The 20K Machines comprise approximately eighty percent (80%) of T-Zone's business.  Tr. 24:12–24.

6.  Approximately ten or fifteen years ago, T-Zone began working with a company called 10 Minute Fitness ("10 Minute Fitness"), also known as Zaaz, to sell the 20K Machines.  Tr. 6:17–7:15, 29:5–7.  The principal of 10 Minute Fitness was and is Ian Cruickshank ("Ian" or "Cruickshank").  Tr. 6:20–7:9.

---

[1]  These findings are based on the preponderance of the evidence presented to the court.

7.  Since 2014, T-Zone has distributed the 20K Machines solely to 10 Minute Fitness.  Tr. 24:9–17, 24:18–25:8.  Thereafter, 10 Minute Fitness was the only seller of the 20K Machines.  Tr. 24:18–20.

8.  10 Minute Fitness's primary customer was Costco, and 10 Minute Fitness sold the 20K Machines at road shows with salesperson kiosks at the Costco stores, with the purchase made through the Costco checkout.  Tr. 7:23–8:3.

9.  From 2014 to 2019, there was a lot of growth in both T-Zone and 10 Minute Fitness.  Tr. 7:19–22.  At the time, 10 Minute Fitness did not have financing and would purchase the 20K Machines on credit from T-Zone.  Tr. 7:19–8:12.  10 Minute Fitness's sales of the 20K Machines grew so rapidly that it needed more financing than T-Zone was willing or able to provide.  Tr. 8:13–19.

10.  Prior to SouthStar's involvement, 10 Minute Fitness fell behind on its payments to T-Zone and, by the time SouthStar became involved, 10 Minute Fitness owed T-Zone over one million dollars.  Tr. 29:11–14.

11.  SouthStar is a South Carolina limited liability company that provides financial services and lending to commercial businesses.  Tr. 66:2–72:23.  Its financial services include purchase order financing and the factoring of accounts receivable.  Id.

12.  On or about May 18, 2019, 10 Minute Fitness entered into a financing relationship with SouthStar through a Non-Recourse Factoring and Security Agreement (the "Factoring Agreement") by and between 10 Minute Fitness and SouthStar's financing company, SouthStar Financial, LLC.  Tr. 8:13–9:2, 67:7–11, 72:24–73:6; SouthStar Ex. 1, Factoring Agreement.

3

13. T-Zone is not a party to the Factoring Agreement.  Factoring Agreement.

14. At the time when SouthStar entered into the financing relationship, there were approximately one thousand machines at the warehouse that T-Zone had already ordered and paid for.  Tr. 9:25–10:19, 37:22–38:6.  These machines constituted approximately two months' supply of inventory.  Id.

15. The Factoring Agreement had comprehensive terms.  Factoring Agreement. SouthStar agreed to provide funding to 10 Minute Fitness for up to eighty percent of the face value of the equipment to be sold in exchange for an assignment of 10 Minute Fitness's accounts receivable generated from the sale of the equipment.  Id.  By virtue of the assignment, payments by Costco and others were remitted directly to SouthStar and not to 10 Minute Fitness.  Id. SouthStar would then charge interest to 10 Minute Fitness on the funds advanced until SouthStar was paid for the account receivable.  Id.  The Factoring Agreement explicitly addressed the potential for default, remedies, and bankruptcy of 10 Minute Fitness.  Id.  However, the Factoring Agreement did not address any rights or obligations by and between SouthStar and any supplier of 10 Minute Fitness.  Id.

16. In addition to the interest and fees charged under the terms of the Factoring Agreement, SouthStar required a first lien security interest against all of 10 Minute Fitness's assets and a personal guaranty from Cruickshank.  Factoring Agreement.

17. As a part of SouthStar's contract negotiations with 10 Minute Fitness, SouthStar requested a subordination agreement from "anyone who ha[d] a

party interest over SouthStar." Tr. 78:18–22. In this instance, SouthStar contacted Morris Aboody ("Mr. Aboody"), the President and CEO of T-Zone, on or around May 22, 2019, to request a subordination agreement so that T-Zone would subordinate the receivables of 10 Minute Fitness. Tr. 77:23–80:8; T-Zone Ex. 24. SouthStar secured a complete release of T-Zone's security interests in 10 Minute Fitness's assets. Tr. 79:4–80:8. Once T-Zone released the UCC liens, SouthStar had a perfected first-security interest in all of 10 Minute Fitness's assets. Tr. 80:4–8.

18. To order the 20K Machines from T-Zone, 10 Minute Fitness would submit a purchase order to T-Zone for a specific number of machines, and T-Zone would then generate and send an invoice to 10 Minute Fitness. Tr. 6:24–7:1; SouthStar Exs. 2–6; 8–9; 11; 13; 15; 17; 19; 20. The invoice would list the number of machines and accessories ordered as well as the total price. Tr. 12:2–13:12.

19. During the time frame of June 2019 through August 2019, after 10 Minute Fitness received the invoice, T-Zone and/or 10 Minute Fitness would often forward another copy of the various invoices to SouthStar. Tr. 12:18–23, 23:9–15. Relevant to this case and during the period in question, T-Zone forwarded a total of thirteen invoices to SouthStar. SouthStar Ex. 32.

20. SouthStar was not aware of every purchase order and invoice exchanged by and between T-Zone and 10 Minute Fitness between June 2019 and August 2019. Compare SouthStar Ex. 32 with SouthStar Ex. 30. For example, T-Zone released $54,000.000 of product, likely equipment parts, to 10 Minute

Fitness without any involvement from SouthStar.  Tr. 36:7–37:12; SouthStar Ex. 30.

21. At issue are six invoices (the "Six Invoices") that T-Zone issued to 10 Minute Fitness.  Tr. 19:1–20:21; SouthStar Exs. 11; 13; 15; 17; 19; 20.  T-Zone released the 20K Machines listed on those six invoices to 10 Minute Fitness without payment and those invoices remain unpaid.  Tr. 21:20–22.  The Six Invoices were:

      a.   T38955 in the amount of $29,948.25, SouthStar Ex. 11;

      b.   T38968 in the amount of $18,461.25, SouthStar Ex. 13;

      c.   T28969 in the amount of $37,743.00, SouthStar Ex. 15;

      d.   T38983 in the amount of $32,820.00, SouthStar Ex. 17;

      e.   T38997 in the amount of $17,072.25, SouthStar Ex. 19; and

      f.   T39009 in the amount of $31,080.25, SouthStar Ex. 20.

Tr. 19:1-20:21.  The Six Invoices total $167,125.00.  Tr. 21:18–19.

22. When T-Zone forwarded its invoices to SouthStar and/or 10 Minute Fitness, T-Zone requested that SouthStar "acknowledge" or confirm its acceptance of the invoice.  Tr. 38:12–40:7, 153:7–13, 179:17–180:2; T-Zone Exs. 9; 10; 11; 12; 15; SouthStar Exs. 12; 14; 16; 18; 22.  However, the email exchanges between SouthStar and T-Zone did not contain payment terms or an explicit agreement to pay the invoice presented.  Tr. 40:2–7, 48:3–51:12; T-Zone Exs. 9; 10; 11; 12; 15; SouthStar Exs. 12; 14; 16; 18; 22.

23. Melanie Brown ("Brown") was the individual at SouthStar who emailed T-Zone to "acknowledge" invoices.  T-Zone Exs. 9; 10; 11; 12; 15; SouthStar

Exs. 12; 14; 16; 18; 22. Brown was a senior account manager at SouthStar but did not have any authority to sign or enter into contracts on behalf of SouthStar. Tr. 111:14–113:6, 118:9–11, 146:7–10, 166:22–167:10.

24. Brown testified that after she replied "acknowledged," T-Zone "would release the machines, which was their decision. We don't have any contract that says otherwise." Tr. 158:17–23. In that context, "acknowledged" only meant that SouthStar had received the invoice but not that it had any obligation to T-Zone because the two parties did not have a contract. Tr. 180:3–10. She further testified that SouthStar's client "Ian would need it immediately to be acknowledged." Tr. 151:14–19, 152:6–12, 173:8–12.

25. T-Zone believed that Brown's acknowledgment of the invoice meant that "she's agreeing to pay the invoice." Tr. 50:10–12.

26. T-Zone agreed that the term "acknowledge" was not defined in any writing between the parties. Tr. 50:4–51:17. T-Zone never followed up in the communications with SouthStar to clarify that T-Zone understood the phrase "acknowledge" to mean that SouthStar was agreeing to pay a particular invoice. Id.

27. Typically, T-Zone would release the equipment prior to payment of the invoice. Tr. 13:9–12, 29:24–30:4, 41:21–42:10.

28. SouthStar testified that it only paid the invoices when it had sufficient receivables available. Tr. 82:10–23, 113:18–24, 116:15–24. For example, on June 20, 2019, SouthStar acknowledged invoice T38866, T-Zone released the related machines, but SouthStar did not pay until July 10, 2019. SouthStar

Ex. 32; Tr. 154:3–9, 156:21–23.  Similarly, on July 3, 2019, SouthStar acknowledged invoice T38898, T-Zone released the machines, but SouthStar did not pay until July 19, 2019.  SouthStar Ex. 32.

29. T-Zone had complete control over the release of the equipment.  Tr. 30:22–31:4, 31:24–32:1, 185:17–19.  Only T-Zone could direct the warehouse to release the 20K Machines.  Tr. 30:13–32:1, 52:12–15.

30. On July 8, 2019, Mr. Aboody emailed SouthStar and stated the relationship would need to be either a straight cash on delivery ("COD") relationship or T-Zone would give SouthStar terms.  Tr. 43:14–44:25; T-Zone Ex. 6; SouthStar Ex. 7.  By offering "terms" to SouthStar, T-Zone was offering credit terms, which Mr. Aboody described as "[w]e set a limit, the amount of money you can borrow, and the term when it needs to be repaid."  Tr. 46:9–17; T-Zone Ex. 6; SouthStar Ex. 7.  T-Zone testified that Mr. Aboody's July 8th communications regarding terms sought "to work out the details" to "tighten up" the specific terms of what the obligations would be to each other.  Tr. 46:9–47:10.

31. SouthStar would typically use supplier letters on occasions when SouthStar paid before the equipment was released.  Tr. 174:2–175:6.  The typical supplier letter says that the supplier agrees to supply the product upon receipt of funds from SouthStar.  Tr. 114:22–115:4, 175:10–16.  When SouthStar offered to have a supplier letter transaction with T-Zone, T-Zone "did not want any sort of contractor agreement in place."  Tr. 174:11–15; see also Tr.

115:5–8 (explaining that Mr. Aboody did not want to get legal involved when offered a supplier agreement with SouthStar).

32. On July 9, 2019, SouthStar's Chief Operating Officer ("COO") Susan Linney ("Linney") responded to Mr. Aboody and said that no terms were needed.  Tr. 43:14–44:25, 94:1–95:16; T-Zone Ex. 6; SouthStar Ex. 7.  Consistent with SouthStar rejecting terms, Mr. Aboody testified that he did not think T-Zone and SouthStar ever set terms.  Mr. Aboody Dep. Tr. 37:22–24.

33. T-Zone testified that COD means that the buyer pays first, and then after receiving payment, the supplier delivers the goods. Tr. 45:1–17.  T-Zone agreed that the purpose of a COD relationship is to protect the supplier from non-payment.  Id.

34. Pursuant to COD terms, T-Zone could have demanded that it be paid COD before releasing any additional 20K Machines from the Warehouse.  Tr. 45:7–23.

35. All Six Invoices include "Payment Term: Net Cash" in their respective comments sections, which is consistent with COD terms.  SouthStar Exs. 11; 13; 15; 19; 20.  T-Zone testified that this meant COD.  Tr. 49:1–6.

36. T-Zone, however, did not supply the 20K Machines in accordance with COD terms but released the equipment prior to receiving payment.  Tr. 52:1–15.  T-Zone testified to its belief that 10 Minute Fitness was "just one of those customers that's a little bit late."  Tr. 52:10–11.

37. Contrary to the COD terms included in each invoice's comment section, T-Zone released the 20K Machines associated with the Six Invoices without receiving payment.  Tr. 19:1–20:21.

38. While 10 Minute Fitness, SouthStar, and T-Zone continued with their transactions in the last quarter of 2019 and the first quarter of 2020, there were several email exchanges between T-Zone and SouthStar inquiring about the Six Invoices.  T-Zone Exs. 16–21.

39. SouthStar testified that the Six Invoices were not paid because 10 Minute Fitness did not have credit available to allow payment to T-Zone under the terms of the Factoring Agreement.  Tr. 82:10–23, 116:15–117:2; see also Tr. 129:9–4 ("I would pay if the funds were available").

40. It is unclear if the equipment from the Six Invoices was sold at Costco. Compare Tr. 172:12–16 (agreeing that Brown had stated in her deposition that SouthStar had received payment from Costco for the machines affiliated with the Six Invoices by November 16, 2019) with Tr. 171:19–23 (testifying at trial in response to the same question and answering, "I can't specifically state if those exact machines had been paid.").

41. By virtue of the assignment, payments by Costco and others were remitted directly to SouthStar and not to 10 Minute Fitness.  Tr. 178:20–179:6, 189:21–25.  During a three-week period in September and October of 2019, SouthStar received payments from Costco on the 10 Minute Fitness account in excess of $1.3 million.  SouthStar Ex. 28; Tr. 140:3–142:8.

42. SouthStar testified that its relationship with 10 Minute Fitness was not profitable. Tr. 125:23–126:2. In total, SouthStar advanced $9,924,427.05 to 10 Minute Fitness (or T-Zone). Tr. 126:5–18; SouthStar Ex. 27. Over the life of the 10 Minute Fitness account, SouthStar received $8,494,497.60. Tr. 126:22–127:7; SouthStar Ex. 28.

43. The exact machines sold at Costco were not trackable by machine, but rather by order. Tr. 178:18–23. SouthStar would "receive receipts from Costco that would have a bulk of machines on it for quantity numbers," which SouthStar would tie to what it had advanced to 10 Minute Fitness. Tr. 179:2–4.

44. SouthStar explained that it kept the Costco money because it had advanced eighty percent (80%) of that amount to T-Zone once the accounts receivable had been created, and the remaining twenty percent (20%) went to charge-backs. Tr. 140:3–142:8. In other words, the received money paid back the eighty-percent advance, plus fees, meaning the total sum received from Costco did not represent available money. Tr. 143:2–6.

45. 10 Minute Fitness could have used the advances from SouthStar to pay the outstanding Six Invoices. Tr. 143:13–15; 190:8–13. Brown testified that she remembered Cruickshank "being involved heavily on where money would go." Tr. 190:15–19. She further testified that every time a payment was made, she would try to run it by Cruickshank. Tr. 190:24–191:3.

46. 10 Minute Fitness is not a party to this lawsuit. Tr. 54:8–25. At the bench trial, T-Zone's general manager Sarah Aboody ("Ms. Aboody") testified that T-Zone never sued 10 Minute Fitness regarding the Six Invoices. Tr. 54:24–

11

25. Mr. Aboody also confirmed and testified in his deposition that T-Zone had not sought payment from 10 Minute Fitness for the Six Invoices because T-Zone believed that 10 Minute Fitness did not have the ability to pay. Mr. Aboody Dep. 43:17–44:6.

### III.  CONCLUSIONS OF LAW

This action is before the court pursuant to diversity jurisdiction. 28 U.S.C. § 1332. T-Zone brings causes of action based in South Carolina state law and, therefore, South Carolina substantive law governs the court's analysis. See Compl. ¶¶ 34–54; Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78–80 (1938). T-Zone brings three alternative causes of action against SouthStar: (1) breach of contract; (2) promissory estoppel; and (3) unjust enrichment.

#### A. Breach of Contract

To establish breach of contract under South Carolina law, a plaintiff must establish three elements: (1) a binding contract entered into by the parties; (2) breach or unjustifiable failure to perform the contract; and (3) damages as a direct and proximate result of the breach. See King v. Carolina First Bank, 26 F. Supp. 3d 510, 517 (D.S.C. 2014). Damages recoverable for a breach of contract must either flow as a natural consequence of the breach or must have been reasonably within the parties' contemplation at the time of the contract. Hawkins v. Greenwood Dev. Corp., 493 S.E.2d 875, 880 (S.C. Ct. App. 1997). Under South Carolina law, to prevail on a breach of contract claim, the plaintiff bears the burden of establishing the three elements of a breach of contract claim by a preponderance of the evidence. See Ferguson v. Waffle

House, Inc., 18 F. Supp. 3d 705, 731 (D.S.C. 2014) (citing Fuller v. E. Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962)).

The court considers each of the challenged elements of a breach of contract claim to determine whether the elements of the claim—contract formation, breach of contract, and proximate causation of damages—are met.  The court ultimately finds that no contract was formed such that there could be no breach of that contract.

"The necessary elements of a contract are an offer, acceptance, and valuable consideration."  Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C. 2003).  "In order for a contract to arise, there must be a meeting of the minds of the parties involved with regard to all essential and material terms of the agreement."  Hardaway Concrete Co. v. Hall Contracting Corp., 647 S.E.2d 488, 492 (S.C. Ct. App. 2007) (citing Player v. Chandler, 382 S.E.2d 891, 893 (S.C. 1989)).  "Thus, for a contract to be binding, material terms cannot be left for future agreement."  Stevens & Wilkinson of S.C., Inc. v. City of Columbia, 762 S.E.2d 696, 701, 703 (S.C. 2014) ("[A]s long as the parties know there is an essential term not yet agreed on, there is no contract.").  "In a contract for services two essential terms are the scope of the work to be performed and the amount of compensation."  Id. at 701 (quoting W.E. Gilbert & Assocs. v. S.C. Nat'l Bank, 330 S.E.2d 307, 309 (S.C. Ct. App. 1985)).  "Although the existence of a contract is ordinarily a question of fact for the jury, where the undisputed facts do not establish a contract, the question becomes one of law."  Id.  "An agreement which leaves open material terms is unenforceable."  Id.

In construing a contract, the primary objective of the court is to ascertain and give effect to the intention of the parties. S. Atl. Fin. Servs., Inc. v. Middleton, 562 S.E.2d

482, 484–85 (S.C. Ct. App. 2002), aff'd as modified, 590 S.E.2d 27 (S.C. 2003). A clear and explicit contract must be construed according to the terms the parties have used, with the terms to be understood in their plain, ordinary, and popular sense. Sphere Drake Ins. Co. v. Litchfield, 438 S.E.2d 275 (S.C. Ct. App. 1993). However, if the court determines the language of the contract is ambiguous, then "parol evidence is admissible to ascertain the true meaning and intent of the parties." Koontz v. Thomas, 511 S.E.2d 407, 411 (S.C. Ct. App. 1999). An ambiguous contract is one that can be understood in more ways than just one or is unclear because it expresses its purpose in an indefinite manner. Id.

The court reiterates a few of its factual findings for purposes of explaining its consideration of T-Zone's breach of contract claim. First, when offered a supplier letter with SouthStar, Mr. Aboody declined on behalf of T-Zone because he did not want to get legal involved. Indeed, each of the T-Zone representatives admitted that they did not want to enter into a contract with SouthStar because T-Zone did not want to get lawyers involved. Tr. 114:3–115:15, 176:4–177:2; Mr. Aboody Dep. Tr. 37:25–38:23.

Second, the July 8–9, 2019 email exchange solidifies the finding that no contract existed between T-Zone and SouthStar. If a valid and enforceable contracted existed, there would be no reason for Mr. Aboody to later ask SouthStar to enter into "terms" for a direct credit arrangement. As indicated in SouthStar's Exhibit 32, from June 17, 2019, up to the time of the July 8, 2019 email, SouthStar had acknowledged ten of the thirteen invoices then received, including three of the Six Invoices. In his email, Mr. Aboody did not state that SouthStar agreed to pay invoices by acknowledging them; instead, Mr. Aboody offered terms or stated the delivery would be COD. T-Zone Ex. 6; SouthStar Ex. 7. This contemporaneous email belies the conclusion that any contract then existed or

14

that T-Zone viewed the acknowledgements SouthStar had previously sent for ten invoices to have established a contractual agreement by SouthStar to pay for the 20K Machines.

Third, SouthStar rejected Mr. Aboody's offered terms. As a result, T-Zone indicated its intent to move forward with the COD relationship where 10 Minute Fitness or SouthStar paid for the machines and only then would T-Zone release the equipment. This COD relationship is evidenced by the terms written on the Six Invoices: "Payment Term: Net Cash." Nonetheless, T-Zone failed to adhere to or enforce its proposed COD relationship when it continued to release equipment to 10 Minute Fitness prior to receiving payment for that equipment.

These three facts lead to the inevitable conclusion that there was no meeting of the minds between the parties with regards to all essential and material terms of the agreement. See Hardaway Concrete Co., 647 S.E.2d at 492. "The 'meeting of minds' required to make a contract valid . . . must be based on a purpose and intention which has been made known or which, from all the circumstances, should be known." Newman v. AFC Enters., Inc., 2007 WL 8327405, at *6 (S.C. Ct. App. Mar. 29, 2007) (citing Player, 382 S.E.2d at 894). The parties' differing interpretations of the word "acknowledge," and T-Zone's testimony that "acknowledge" was never defined or clarified in any writing, together lead the court to conclude that there was no meeting of the minds. Additionally, Mr. Aboody's July 8th email indicates that material terms—such as when payments were to be made and when equipment was to be delivered—were left for future agreement. See Stevens & Wilkinson of S.C., Inc., 762 S.E.2d at 701. "In a contract for services two essential terms are the scope of the work to be performed and the amount of compensation." Id. (quoting W.E. Gilbert & Assocs., 330 S.E.2d at 309); see also Edens

15

v. Laurel Hill, Inc., 247 S.E.2d 434, 436 (S.C. 1978) ("Some terms are considered

indispensable to a binding contract. Among these are price, time and place."). The

ambiguity as to when T-Zone would, or should, release the equipment and when

SouthStar and/or 10 Minute Fitness would pay the invoices also leads the court to

conclude that there was no meeting of the minds. Altogether, the court concludes that no

contract was formed, and the court need not reach whether the unformed contract was

breached or whether that unformed contract proximately caused damages.[2] For these

reasons, the court finds for SouthStar on T-Zone's breach of contract claim.

### B. Promissory Estoppel

The doctrine of promissory estoppel was first recognized in South Carolina in

Higgins Construction Co. v. Southern Bell Telephone & Telegraph Co., 281 S.E.2d 469

(S.C. 1981). "[The] doctrine holds 'an estoppel may arise from the making of a promise,

even though without consideration, if it was intended that the promise should be relied

upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to

sanction the perpetration of fraud or would result in other injustice.'" Id. at 470 (quoting

28 Am. Jur. 2d Estoppel and Waiver § 48 (1966)). However, "[a] contract and

promissory estoppel are two separate and distinct legal theories. They 'are two different

creatures of the law; they are not legally synonymous; the birth of one does not spawn the

other." Satcher v. Satcher, 570 S.E.2d 535, 538 (S.C. Ct. App. 2002) (quoting Duke

Power Co. v. S.C. Pub. Serv. Comm'n, 326 S.E.2d 395, 406 (S.C. 1985)).

The essential elements of promissory estoppel are:

---

[2] However, if the court were to reach these two inquiries, it would find that T-Zone breached its own COD terms when it released the equipment prior to payment. As such, T-Zone proximately caused its own damages.

> (1) [T]he presence of a promise unambiguous in its terms, (2) reasonable reliance upon the promise by the party to whom the promise is made, (3) the reliance is expected and foreseeable by the party who makes the promise, and (4) the party to whom the promise is made must sustain injury in reliance on the promise.

Cruz v. City of Columbia, 2024 WL 3435968, at *1 (S.C. July 17, 2024) (quoting

Thomerson v. DeVito, 844 S.E.2d 378, 383 (S.C. 2020)) (alteration in original).  "The

applicability of the doctrine depends on whether the refusal to apply it 'would be virtually

to sanction the perpetration of a fraud or would result in other injustice.'"  Satcher, 570

S.E.2d at 538 (quoting Citizens Bank v. Gregory's Warehouse, Inc., S.E.2d 316, 318

(S.C. Ct. App. 1988)).  "Notably, neither meeting of the minds nor consideration is a

necessary element."  Barnes v. Johnson, 742 S.E.2d 6, 11 (S.C. Ct. App. 2013), abrogated

on other grounds by Cruz, 2024 WL 3435968.  "Thus, in the interest of equity, the

doctrine 'looks at a promise, its subsequent effect on the promisee,' and where

appropriate 'bars the promisor from making an inconsistent disposition of the property.'"

Id. (quoting Satcher, 570 S.E.2d at 538).  However, "the presence of either an ambiguous

promise or an injury not arising out of the inconsistent disposition precludes promissory

estoppel's application, though perceived inequities may exist."  Id. at 12.  As the South

Carolina Court of Appeals recently noted, "[a]dmittedly, determining exactly what [an

injury in reliance on an unambiguous promise] means in a particular case can be difficult,

and every promise cannot be enforced based solely on the promisee's hope the promisor

will follow through."  Cruz v. City of Columbia, 877 S.E.2d 479, 483 (S.C. Ct. App.

2022), aff'd in part, vacated in part on other grounds, 2024 WL 3435968.

Initially, the court notes that T-Zone has not sued 10 Minute Fitness, or its

principal Ian Cruickshank, for failure to pay for the invoices.  "In South Carolina, a party

is generally precluded from pursuing a claim for either unjust enrichment or promissory

estoppel where a valid contract governs the subject matter in dispute." Besley v. FCA US, LLC, 2016 WL 109887, at *3 (D.S.C. Jan. 8, 2016). In this case, the purchase orders and invoices are explicitly between T-Zone and 10 Minute Fitness, creating a contract between those two parties. T-Zone has a contractual remedy against 10 Minute Fitness and cannot seek to recover in equity where it has a remedy at law. See Lynch v. Sease, 244 F. App'x 736, 739 (6th Cir. 2007) (applying South Carolina law) ("If a valid, enforceable contract exists between the parties as to a certain issue, their rights and obligations are governed solely by the contract terms."). Where T-Zone has another remedy that makes it whole—namely, a lawsuit for breach of contract brought against 10 Minute Fitness—there is no need for the equitable doctrine of promissory estoppel. See id. This court has previously considered this factual scenario in a related case, involving the same parties but different facts, and T-Zone's equitable claims are barred under this court's prior decision. See T-Zone Health Inc. v. SouthStar Cap. LLC, 2023 WL 5108500, at *13–14 (D.S.C. Aug. 9, 2023). In any event, the court also separately concludes that T-Zone has not met its burden to prove promissory estoppel.

For many of the same reasons discussed when the court was considering T-Zone's breach of contract claim, the court finds that T-Zone's promissory estoppel claim fails. T-Zone failed to establish a promise unambiguous on its terms. See Cruz, 2024 WL 3435968, at *1. To reiterate, testimony from Ms. Aboody of T-Zone and from Linney and Brown of SouthStar clearly shows that the parties had no mutual understanding of what it meant for SouthStar to "acknowledge" an invoice. T-Zone has admitted that "acknowledge" was never defined in writing and that it never sought to clarify or follow up with SouthStar what it intended "acknowledge" to mean.

In addition to an unambiguous promise, T-Zone also must establish its reliance on that promise was reasonable and that its reliance was expected and foreseeable by SouthStar.  See Cruz, 2024 WL 3435968, at *1.  T-Zone has not met its burden of proof on these elements.   To reiterate, Mr. Aboody sought "terms" or to establish a COD relationship after SouthStar had previously "acknowledged" ten invoices.  The July 8, 2019 email leads to the conclusions both that "acknowledge" did not unambiguously promise payment—since ambiguity in payment terms led Mr. Aboody to send the email—and that T-Zone was not relying on SouthStar's "acknowledgement," of which it had received ten.  Conversely, because Mr. Aboody sought to clarify terms after SouthStar had previously sent acknowledgements of invoices, it was not reasonable or foreseeable to SouthStar that T-Zone would be relying on those acknowledgements going forward.

Thus, T-Zone has not proven that there was an unambiguous promise, that it relied on that promise, or that SouthStar expected T-Zone to rely on the promise.  The court need not reach the remaining question of damages.[3]  For these reasons, the court finds for SouthStar on T-Zone's promissory estoppel claim.

### C.  Unjust Enrichment

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff."  Dema v. Tenet Physician Servs.-Hilton Head, Inc., 678 S.E.2d 430, 434 (S.C. 2009).  The plaintiff may not recover under unjust enrichment if the tasks the plaintiff is seeking

---

[3] However, if the court were to reach damages, it would similarly find that T-Zone proximately caused its own damages when it released the equipment prior to receiving payment for it, which violated its own self-imposed COD terms.

compensation for under quantum meruit are encompassed within the terms of an express contract which has not been abandoned or rescinded.  Paul L. Kennedy Enters., Inc. v. Manganaro Se., LLC, 2023 WL 1420030, at *3 (D.S.C. Jan. 31, 2023) (citing Swanson v. Stratos, 564 S.E.2d 117, 120 (S.C. Ct. App. 2002)); cf. Columbia Wholesale Co. v. Scudder May N.V., 440 S.E.2d 129, 131 (S.C. 1994) (denying recovery in cases in which a subcontractor sues a property owner and the property owner properly paid the general contractor).  The court reiterates that T-Zone's damages are encompassed within the terms of an express contract with 10 Minute Fitness that has not been abandoned or rescinded, such that T-Zone may not recover under unjust enrichment.  Moreover, a consideration of the elements of unjust enrichment leads the court to conclude that T-Zone has not met its burden of proof as to this claim.

To succeed on an unjust enrichment claim, a plaintiff must prove: "(1) [a] benefit conferred by plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value."  Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868, 872 (S.C. 2000).  "The South Carolina Supreme Court defined benefits as 'goods or services.'"  Quintech Sec. Consultants, Inc. v. Intralot USA, Inc., 2011 WL 5105446, at *4 (D.S.C. Oct. 27, 2011) (citing Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 684 S.E.2d 756, 764 (S.C. 2009)).  "In a law action, the measure of damages is determined by the parties' agreement, while in equity, the measure of the recovery is the extent of the duty or obligation imposed by law, and is expressed by the amount which the court considers the defendant has been unjustly enriched at the expense of the plaintiff."  QHG of Lake City, Inc. v. McCutcheon, 600

S.E.2d 105, 108 (S.C. Ct. App. 2004) (internal quotation marks omitted) (quoting <u>Myrtle Beach Hosp.</u>, 532 S.E.2d at 872).

Even had the court not found that an equitable remedy was barred by the express contract between T-Zone and 10 Minute Fitness, it would nevertheless find that T-Zone has not met its burden of proof on this claim.  Namely, T-Zone cannot identify a benefit that it conferred on SouthStar.  To meet this burden at trial, it would have first needed to have established that the equipment affiliated with the Six Invoices was sold.  This would have been difficult burden in this case because Costco provided receipts for a quantity of machines sold that was effectively divorced from the initial accounts receivable.  Tr. 178:24–179:9 (describing that there is no ability to tie which machines were released with when those machines were paid for at Costco).  At most, T-Zone points to Brown's deposition testimony in which she said that SouthStar had received payment from Costco for the machines affiliated with the Six Invoices by November 16, 2019.  Tr. 172:12–16.  However, that assertion is contradicted, in part, by Brown's testimony at trial when, in response to the same question, she stated "I can't specifically state if those exact machines had been paid."  Tr. 171:19–23.  Alternatively, T-Zone points to Linney's agreement that all of the accounts receivable for 10 Minute Fitness arose out of the equipment provided by T-Zone.  <u>See</u> Tr. 140:25–141:3.  The unjust enrichment claim is not about <u>all</u> of the accounts receivable, it is about the specific accounts receivable affiliated with the Six Invoices.  The contradictions in Brown's testimony, along with the difficulty tying Costco payments to specific machines, leads the court to conclude that T-Zone has not met its burden to show that 10 Minute Fitness had sold the machines from the Six Invoices.

However, even if T-Zone had met its burden to show the sale of the equipment, T-Zone would also need to establish that SouthStar personally benefited from the sale of those specific machines.  See Boykin Contracting, Inc. v. Kirby, 748 S.E.2d 795, 798 (S.C. Ct. App. 2013).  This is the amount which the court considers the defendant has been unjustly enriched at the expense of the plaintiff.  QHG of Lake City, Inc., 600 S.E.2d at 108.  T-Zone has clearly not met its burden of proof on this prong.  At most, T-Zone points to the millions of dollars that SouthStar received in receipts from Costco.  See Tr. 139:8–142:19.  In essence, T-Zone points to the benefits SouthStar received from the Factoring Agreement without addressing the benefits 10 Minute Fitness received in exchange.

To point at solely SouthStar's assignment of 10 Minute Fitness's accounts receivable neglects to address the advances SouthStar provided to 10 Minute Fitness for those accounts.  The Factoring Agreement stipulates that SouthStar would advance 10 Minute Fitness eighty percent of the face value of the equipment to be sold in exchange for an assignment of the accounts receivable generated from the sale of the equipment.  SouthStar Ex. 1.  Linney testified that when a receipt came in from Costco, SouthStar would apply that money to the oldest advances.  Tr. 139:8–11.  As for the twenty percent of the receipt that was not advanced to 10 Minute Fitness, that amount was typically devoted to the "charge-backs or advances or something that needed to be covered."  Tr. 139:12–24, 141:17–24.  The question remains: what profits, if any, did SouthStar accrue at the expense of T-Zone based on the equipment provided from the Six Invoices.  The testimony at trial indicates that SouthStar incurred net losses on the 10 Minute Fitness account, such that it was not inequitable for SouthStar to seek to recoup the money to

which it was entitled from Costco.  Tr. 125:23–25.  T-Zone has neither proven that the equipment identified in the Six Invoices was sold nor has T-Zone tied any specific profits enjoyed by SouthStar relating to that equipment.  In sum, T-Zone has not met its burden of proof to demonstrate that SouthStar personally benefited such that T-Zone's claim for unjust enrichment must fail.  See Myrtle Beach Hosp., 532 S.E.2d at 872.

## IV.   CONCLUSION

For the reasons set forth above, the court **FINDS FOR THE DEFENDANT.**

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 29, 2024**
**Charleston, South Carolina**